# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MITCHELL BLANKENSHIP,
**PLAINTIFF**

CASE NO. 1:07-cv-1004-SAS-TSH
(SPIEGEL, Sr. J.)
(HOGAN, M. J.)

VS.

COMMISSIONER OF SOCIAL SECURITY,
**DEFENDANT**

## REPORT AND RECOMMENDATION

Plaintiff filed his application for Disability Insurance Benefits (DIB) and
Supplemental Security Income (SSI) in January, 2001. The application was
denied both initially and upon reconsideration. Plaintiff then requested and
obtained a hearing before Administrative Law Judge (ALJ) Pace in March, 2002
in Huntington, West Virginia. Plaintiff, who was represented by counsel, testified
at the hearing as did Vocational Expert Ted Tanzey. The ALJ found that Plaintiff
had a severe impairment based on a combination of impairments: (1) pain, status
post left knee meniscus repair surgery, (2) degenerative disc disease of the cervical
spine, (3) left elbow tendinitis, (4) chronic obstructive pulmonary disease
(bronchial asthma), (5) anti-social personality disorder, (6) bipolar disorder and
(7) alcohol dependence. ALJ Pace found that Plaintiff could perform a limited
range of sedentary work. Plaintiff processed an appeal to the Appeals Council and
the Appeals Council denied review in September, 2002, but ultimately remanded

the case in July, 2005. Two subsequent hearings before ALJ Rodner occurred in March and in May, 2006, in Portsmouth, Ohio. Plaintiff, who was represented by counsel, testified as did VEs Donald Woolwine and Robert Breslin. The ALJ found that Plaintiff's physical impairments to be non-severe and his mental impairments to be severe as exacerbated by alcohol abuse/dependence. ALJ Rodner found Plaintiff to be capable of a restricted range of sedentary work in an opinion dated August, 2006. Again, the Appeals Council denied review in October, 2007. Finally, in December, 2007, Plaintiff filed his Complaint with this Court seeking judicial review.

The Administrative Record in this case is 960 pages long, a new record for this reviewer.

## STATEMENTS OF ERROR

Plaintiff listed his Statements of Error in the form of "issues." These are as follows: "The Commissioner's decision is not supported by substantial evidence because: (1) Plaintiff's substance abuse was not a contributing factor material to a finding of his disability, (2) The ALJ did not properly weigh the evidence, (3) The ALJ did not properly construct the claimant's residual functional capacity and (4) The ALJ committed reversible error in finding Plaintiff not credible."

## PLAINTIFF'S TESTIMONY AT THE HEARINGS

At the first hearing on March 5, 2002, Plaintiff told ALJ Pace that he was 41 years of age, that he possessed a GED and had prior work experience as a cook, dishwasher, meat cutter, fruit cutter and carnival ride operator, all of which were unskilled work, according to the VE . He is 5'7" tall and weighs 125 lbs. Plaintiff

2

reported having had surgery on his left knee and suffering from emphysema and asthma and being claustrophobic. Plaintiff reported being divorced and living with his son. He said that he smoked 1/2 pack per day and only drank 3 days per week. Plaintiff testified that he was fired from the meat cutting job for apparently excessive absences and inability to load trucks because of back pain. He said that during periods of depression, he had a "short fuse" and that personality clashes resulted. Plaintiff said that he has been "under counseling for drug and alcohol abuse" multiple times and has had "approximately three detoxication periods." He has a driver's license.

When asked how long he could sit, Plaintiff said 15-20 minutes in an hour. He estimated that he could stand for 15 minutes. He testified that he could not lift more than a loaf of bread with his left arm, but could lift a gallon of milk into a grocery cart with both hands. He took Ibuprofen and Aleve for pain and Servant and Asthmacort for respiratory problems. He has an inhaler and takes breathing treatments. He reported taking no medications for anxiety, but suffering from short-term memory loss.

Plaintiff reported being married three times and spending time in jail for obstruction of justice, violating probation and domestic violence. Plaintiff reported being in physical therapy for tendonitis in his left shoulder and for his knee. He said that he experienced pain in both elbows and shoulders and has periodic asthma attacks, for which he uses an inhaler. He said that he lost 70% of his past jobs because of alcohol abuse. (Tr., Pgs. 253-275).

The second hearing was in March, 2006 in Portsmouth, Ohio. Plaintiff reported then that he was married and living with his wife and her 23- year-old son. He testified that his weight was now 148 lbs. He was last able to work

3

steadily in November, 1998. Since then he tried working through a temporary agency, but was able to work for only a couple of days and had to quit because of back and leg pain. (Tr., Pgs. 883-892).

The third hearing was held in May, 2006 in Portsmouth, Ohio. Plaintiff testified about his last employment as a meat cutter in 1998. An adversarial relationship with his supervisor developed after Plaintiff experienced difficulty unloading trucks because of back pain and excessive absences because of cold and flu. Prior to that, Plaintiff worked as a light installer, bin operator, air vent builder, machine operator, cook, dishwasher, wood cutter and carnival ride operator. Plaintiff reported that he experienced worsening back pain and pain in both shoulders, with the left worse than the right. He rated his shoulder pain as a "ten" on a 10-point scale. The pain was treated by medications: Tylenol, Advil, Oxaprozin, Naproxen and Lodine. He identified Dr. Ellison as his primary care physician. He was also taking Zantac, Flexeril, Tramadol, Colace, Wellbutrin, Zoloft, Azmacort, Serevent and Albuterol. He was able to sleep in a fetal position on his right side.

Plaintiff also reported knee pain with the left knee being worse than the right. Dr. Steel performed surgery on his left knee in 2000 and Dr. Amendt performed surgery on both knees in 2005. He also reported radiating pain down his left leg and said that he has had multiple Cortisone injections in both arms. He also reported failing eyesight and depression and having seen Dr. Gardener, a psychiatrist, for depression since 2003.

Plaintiff admitted having trouble with drinking, and "falling off the wagon" after attempting to quit. He attended AA, but didn't follow through with the program. He does relatively nothing around the house, hides out in the garage to

4

avoid contact with his wife, enjoys movies, but avoids crowds. He estimated that he could sit for 20 minutes, stand for 1/2 hour and walk for a block.

In response to his attorney's questions, Plaintiff testified that he experiences anxiety when in large groups. He has panic attacks, which cause breathing difficulties and heart flutters. Plaintiff said that he drinks one beer per night to help him sleep. He testified that he experiences constant headaches because of "deteriorating bones in his neck." He has suicidal thoughts. He tried to quit smoking, but the "patches" causes an allergic reaction. Plaintiff also said that he had a fungus infection under his fingernails. (Tr., Pgs. 897-941).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE a number of hypothetical questions. The first asked the VE to assume Plaintiff could sit for 6 hours in a workday, stand/walk for 2 hours and lift 10 lbs. frequently and 20 lbs. occasionally. Plaintiff cannot reach overhead and should avoid exposure to temperature extremes and pulmonary irritants. He should have minimal interaction with co-workers and is limited to simple one and two-step instructions, routine and repetitive tasks. He should avoid a rapid constant pace. The VE responded that Plaintiff could perform a representative number of unskilled sedentary jobs.

The second hypothetical asked the VE to assume the accuracy of the report of Sheila Emerson Kelly in February, 2002. This is Exhibit B11F/13. The VE responded that Plaintiff could not perform any jobs.

The third hypothetical asked the VE to assume the accuracy of Exhibit B13/F, the report of Penny Purdue. The VE responded that Plaintiff could not perform any jobs.

The Fourth hypothetical asked the VE to assume the accuracy of the report of Dr. Nancy Lares, Exhibit B37F/18. The VE responded that Plaintiff could not perform any jobs.

The fifth hypothetical asked the VE to assume that Plaintiff was able to lift 10 lbs. occasionally and 5 lbs. frequently. The next portion of the ALJ's hypothetical is subject to interpretation. The ALJ asked that his hypothetical "have the same limitations otherwise." The Court assumes that the ALJ was modifying his first hypothetical and not his fourth. The VE responded that the weight reduction would not affect the number of jobs he listed in response to the first hypothetical.

The sixth hypothetical asked the VE to assume the accuracy of Exhibit B42/F, the report of Laberta Salamacha. The VE responded that no jobs would be available.

The seventh hypothetical asked the VE to assume the accuracy of Plaintiff's testimony on May 12, 2006. The VE responded that Plaintiff would be unemployable.

Plaintiff counsel asked the VE whether a person with a GAF of 30 could engage in competitive employment. The VE responded in the negative. (Seven hypotheticals to a VE is also a new record for this reviewer).

## THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff had a number of physical impairments, none of which met any Listing. The ALJ further found that Plaintiff had the following severe mental impairments: depressive and anxiety disorders, personality disorders and a history of alcohol abuse/dependence. The ALJ found that prior to June 28,

6

2004, alcoholism was a contributing factor to his disability and thus he was ineligible for disability payments. The ALJ found that after June 28, 2004, Plaintiff reduced his drinking such that he retained the residual functional capacity to perform in accordance with the ALJ's fifth hypothetical and therefore could perform the jobs of sedentary assembly, production, inspection and hand-packaging, all of which were found in representative numbers in the national economy.

## THE MEDICAL EVIDENCE

Plaintiff's medical file begins with an emergency room visit in October, 2000 at St. Mary's Hospital in Huntington, West Virginia. The reason for the visit was recurring left knee pain, first noticed 20 years previous after a fall from a horse, and aggravated 1 year later by a fall from the hood of a moving vehicle. A x-ray was negative. The diagnosis was "recurrent left knee strain." Plaintiff was prescribed Naprosyn and Robaxin and given a knee brace. (Tr., Pgs. 102-105).

A Physical Residual Functional Capacity (RFC) Assessment was done in February, 2001 by a medical doctor, whose name we cannot decipher. According to the Assessment, Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently. He could stand/walk for 6 hours in a workday and sit for 6 hours. He had both knee and back pain. (Tr. Pgs. 112-118). In March, 2001, Plaintiff was treated at the emergency room of Cabell Huntington Hospital for chest pain and shortness of breath. A chest x-ray was normal. It is not clear what treatment was rendered, but Plaintiff was discharged with a diagnosis of COPD. (Tr. Pgs. 119-124).

In February, 2001, Plaintiff visited Ebenezer Medical Outreach, Inc. in Huntington with elbow pain. An x-ray showed "no bony abnormalities," but

7

Plaintiff could not fully extend the elbow. (Tr., Pgs. 126-128). In January, 2001, Imre Szendi-Harvath, M.D., reported that Plaintiff had a "torn medial meniscus of the left knee" and needed immediate surgery. In December, 2000, Dr. Szendi-Horvath reported that Plaintiff had "marked tenderness of the right medial joint line," but "no ligamentous instability." (Tr., Pg. 132). An MRI taken in December, 2000 confirmed the diagnosis of "horizontal tear of the posterior horn of the medial meniscus." (Tr., Pg. 133).

In May, 2001, Plaintiff saw Dennis Charette, M.D. for chronic obstructive pulmonary disease (COPD). Dr. Charette reported that Plaintiff was doing well with prophylaxis, Serevent, Azmacort and rescue inhaler." He was advised to stop smoking and to take Zyban for GERD-like symptoms. Plaintiff was also advised to take Zantac. (Tr., Pgs. 139-140). In March, 2001, Dr. Charette reported that Plaintiff's "emphysema was showing good respiratory control." (Tr., 141). In March, 2001, Dr. Charette reported that on March 2, 2000, Plaintiff was transported to the emergency room by ambulance for "sudden acute onset of trouble breathing." He was given Proventil, which "resolved his symptoms." He was discharged on Proventil and Prednisone. (Tr., Pgs. 143-144).

Another Physical RFC Assessment was completed in August, 2001 by a non-treating and non-examining physician whose name we cannot determine. The doctor said that Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently, stand/walk for 6 hours in a workday and sit for 6 hours in a workday. He should never climb ladders, ropes or scaffolds and should avoid unlimited exposure to cold, dust and fumes. He should avoid concentrated exposure to cold, dust and fumes and even moderate exposure to vibration. (Tr., Pgs. 146-153).

Plaintiff underwent arthroscopic repair of the torn meniscus of his left knee

8

in April, 2001 by Jack Steel, M.D., an orthopaedic surgeon. In May, 2001, Dr. Steel reported that after surgery, Plaintiff was to complete rehab, but at the 18-day point, he "demonstrated full pain-free range of motion of the knee" and was "healing nicely." (Tr. Pgs. 154-156).

A lung x-ray in April, 2001 showed "no active disease." (Tr., Pg. 157). So did another in June, 1996 (Tr., Pg. 177).

Plaintiff saw Dr. Steel in January, 2001 for right shoulder pain and left knee pain. He had Cortisone injections. An x-ray of the right shoulder showed a "type II acromium." He was diagnosed with "subacromial bursitis, superaspinatus tendinitis and mild impingement, right shoulder" and referred for physical therapy. (Tr., Pgs. 158-159).

In January, 2002, Physical Therapist Daryl White reported that Plaintiff had started a program for rotator cuff strengthening (Tr., Pg. 163). In April, 2001, Plaintiff started a similar program for his left knee. (Tr., Pg. 171). In July, 1997, Plaintiff saw D.O. Wright, M.D., for left elbow pain. He had a history of pulmonary problems and bronchitis. The diagnosis was "acute tendinitis, left elbow." X-rays showed no fracture. His arm was iced and placed in a sling. (Tr., Pgs. 183-185). In September, 1997, Plaintiff sought emergency room service at St. Mary's Hospital for left arm pain. A cardiac work-up was normal. He was discharged with prescriptions for Flexeril and Darvocet. (Tr., Pgs. 188-189).

In November, 2001, Plaintiff again visited the emergency room at St. Mary's for back pain after suffering a fall. Prior to the fall, Plaintiff had consumed a large amount of beer. X-rays of the lumbosacral spine were negative. Plaintiff was discharged with prescriptions for Motrin, Robaxin and Darvocet. (Tr., Pgs. 192-193). In April, 2001, a chest x-ray was negative. (Tr., Pg. 198).

9

A psychological evaluation was done in February, 2002 by Sheila Emerson Kelly, M. A, licensed psychologist. The history given to Ms. Kelly showed that Plaintiff was convicted of breaking and entering, for which he received a probationary sentence and then violated his probation by alcohol or drug abuse, which resulted in his imprisonment for approximately one year. In addition, Plaintiff told Ms. Kelly that he had been convicted of 3 DUI offenses, a drug offense at the felony level in Florida, and a smattering of other crimes. Plaintiff told Ms. Kelly that he is one of 11 children, 10 of which are alcoholics. He has been married 3 times and lives with a disabled son, who supports him through disability payments. IQ testing demonstrated a full-scale IQ of 93. Ms. Kelly described Plaintiff as of average intelligence, but "having significant problems with authority" and "having little in the way of social contacts" outside of his dysfunctional family. His academic skills are "not good" because of his limited educational background. Ms. Kelly's diagnostic impressions were ADHD, Antisocial Personality Disorder and Alcohol Dependence. She described him as "impulsive, defiant, reckless and full of attitude." Ms. Kelly found marked limitations of Plaintiff's ability to maintain regular attendance, complete a normal workday without interruptions, accept instructions and respond to criticism (Tr. Pgs. 205-218 and 542-555)

Another psychological examination was done in April, 2002, by Ms. Penny Perdue. The history indicated that Plaintiff suffered from depression, including several suicide attempts, claustrophobia, anger control problems, symptoms suggestive of ADHD, and unstable personal relationships. He reported nightly drinking and stated he started drinking at age 6. Intelligence testing showed a full-scale IQ of 94. Ms. Kelly diagnosed Plaintiff with a multitude of problems,

including: Bipolar Disorder, Alcohol Dependence, a Situational Phobia, Maladaptive Health Behaviors (smoking when one has emphysema), Antisocial Personality Disorder and Borderline Personality Disorder. She rated his social abilities as "mildly deficient," his concentration as "normal," his pace as "somewhat fast," his persistence as "normal," his immediate memory as "normal," his remote memory as "moderately deficient," and his ability to manage funds as "not competent due to current alcohol usage." (Tr., Pgs. 221-226). Ms. Purdue found marked deficiencies in Plaintiff's ability to carry out detailed instructions, interact appropriately with the public and supervisors and respond appropriately to work pressures and changes. (Tr., Pgs. 227-228).

A test of pulmonary function in November, 2001 showed "mild obstructive defect, mild hyperinflation and elevated airway resistance." (Tr., Pgs. 233-234).

Plaintiff saw Thomas Verme, M.D., in October. 1996 after coughing up blood. He was diagnosed with "chronic bronchitis." He was prescribed antibiotics, advised to quit smoking and was prescribed Relafen for right shoulder pain. In August, 1996, Plaintiff saw Dr. Verme for low back and pelvic pain. Urinalysis was "unremarkable." He was diagnosed with "probable prostatitis" and "chronic bronchitis," treated with Bactrin and advised to quit smoking. His consumption level was 1.5 packs per day at that time. (Tr., Pgs. 484-485).

Plaintiff began seeing Robert Ballard, D.C., a chiropractor, in January, 2002 for lower back pain. In addition to the two accidents, previously related to other practitioners, Plaintiff said that he was involved as a passenger in a third accident in 1984, at which time an accelerator stuck and the vehicle went through a block gas station wall. Dr. Ballard said an x-ray showed "subluxations at L5-S1." Adjustments seemed to help. (Tr., Pgs. 555-562).

11

Dr. Steel was consulted in May, 2002, approximately 1 year after his left knee surgery. Dr. Steel reported that the knee was "stable," but noted a "slight tenderness at the medial joint space." A sample of Bextra was provided. In February, Plaintiff saw Dr. Steel for his left elbow, which was diagnosed as "tennis elbow." He was provided with an elbow strap. In January, 2001, Plaintiff consulted Dr. Steel for right shoulder pain and based on an x-ray, Plaintiff was diagnosed with "type II acromium." He was referred for physical therapy. In May, 2001, Dr. Steel noted that Plaintiff had a full range of motion in his left knee. (Tr., Pgs. 571-575).

In August, 2002, Plaintiff was evaluated by clinical psychologist, Samuel Goots, Ph.D. Dr. Goots found that Plaintiff had mild difficulty maintaining concentration, persistence or pace and a moderate difficulty maintaining social functioning. He was diagnosed with a personality disorder, one of the diagnostic criteria for which was listed as "intense and unstable interpersonal relationships and impulsive and damaging behavior." One might question how one can have only a moderate difficulty maintaining social functioning if one has intense and unstable interpersonal relationships. (Tr., Pgs. 589-606).

In October, 2002, Plaintiff was examined by Steven Nutter, M.D., whose specialty is occupational medicine. Plaintiff told Dr. Nutter that he had smoked at the rate of one pack per day for 29 years and drinks too much. He had pain and decreased range of motion in his neck and back. Straight leg raising, Tinel's and Phalen's signs were negative. Grip strength and motor modalities were intact, but sensory modalities were abnormal in the arms with numbness along the entire arm. Joint pain in the shoulders, left elbow, both wrists and the left knee and right hip is consistent with osteoarthritis. Although Plaintiff complained of shortness of

12

breath and chest pains, the pulmonary examination was normal and there was no evidence of congestive heart failure. (Tr., Pgs. 607- 613).

In October, 2002, Eli Rubinstein, M.D. read x-rays of Plaintiff's lumbar spine and found them to be normal. (Tr., Pg. 616).

A Physical Residual Functional Capacity Assessment was done in November, 2002 by Hugh Brown, M.D. Dr. Brown opined that Plaintiff could occasionally lift 50 lbs., frequently lift 25 lbs., stand/walk for 6 hours in a workday and sit for 6 hours in a workday. Dr. Brown opined that Plaintiff should avoid concentrated exposure to fumes and odors, but should be able to handle medium work. (Tr., Pgs. 621-627).

In January, 2003, Plaintiff was admitted to St. Mary's Hospital for a 6-day stay following a suicide attempt by ingesting a large amount of Zoloft and Neurontin tablets. He was diagnosed with major depressive disorder, anxiety disorder, and alcohol abuse. A GAF of 30 was assigned upon admission and a GAF of 55 was assigned at discharge. A chest x-ray showed normal heart size and an CAT scan of the head was normal. He was referred to AA and a mental health center for treatment. (Tr., Pgs. 628-639).

Another Physical RFC Assessment was done in April, 2003 by a medical doctor, whose name we cannot decipher. That doctor found that Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently. He could stand/walk for 6 hours in a workday and sit for 6 hours in a workday. Because of his "mild" chronic obstructive pulmonary disease, Plaintiff should avoid concentrated exposure to dust and odors (Tr., Pgs. 640-647).

Plaintiff was evaluated by Donna Adams, M.D. at University Family Practice at Huntington, West Virginia in November, 2002. Dr. Adams said that

Plaintiff had chronic pain in his neck, knees, shoulders and elbows, as well as COPD and psychiatric problems. Dr. Adams felt that Plaintiff also had ADHD, which Plaintiff refused to have evaluated. Dr. Adams opined that Plaintiff had "poor work potential" and a "poor ability to carry, sit, stand for prolonged times." Dr. Adams also indicated that Plaintiff would have a "poor ability to perform tasks which required attention and poor interaction with the public." (Tr., Pgs. 648-661).

Mr. Blankenship was evaluated in April 2003 by James Coppage, Ph.D., a clinical psychologist. Dr. Coppage felt that Plaintiff met Listing 12.09(D). Dr. Coppage diagnosed Plaintiff with Bipolar Disorder, Anxiety Disorder, Antisocial Personality Disorder and a Substance Abuse Disorder. Dr. Coppage found that Plaintiff had marked restrictions of his ability to maintain social functioning and maintain concentration, persistence or pace (Tr., Pgs. 662- 674). Dr. Coppage also evaluated Plaintiff without substance abuse as a factor. With substance abuse discounted, Dr. Coppage felt that Plaintiff's deficiencies regarding his ability to maintain social functioning were moderate and his difficulty maintaining concentration, persistence or pace were only mild. Dr Coppage concluded by opining that Plaintiff would "retain the mental-emotional capacity to perform fairly complex tasks in a low-pressure setting." (Tr., Pgs. 676-693).

Plaintiff was evaluated in May, 2004 by Kelly Dick/Stephen Cody, Ph.D., clinical psychologists at University Psychiatric Associates in Huntington at the request of Dr. Adams in May, 2004. Plaintiff presented with complaints of difficulty staying asleep, depression, including four suicide attempts, panic attacks, claustrophobia, impulse control and others. He had been married three times, convicted of alcohol-related offenses multiple times and convicted of four felonies. The psychologists estimated that Plaintiff's IQ was low-average. He

was diagnosed with Depressive Disorder, Anxiety Disorder and Antisocial Personality Disorder, among other things. The treatment plan consisted of possible psychotropic medication and psychotherapy. (Tr., Pgs. 701-705).

X-rays taken in May, 2004 of Plaintiff's chest, after reports of left chest pain, showed "no pulmonary or cardiac abnormality." (Tr., Pg. 722). An MRI of Plaintiff's left knee in September, 2005 showed a "tear of the posterior horn of the medial meniscus." (Tr., Pg. 738). Surgery was done in October, 2005 by Wayne Amendt, M.D., an orthopaedic surgeon. After the passage of one week from surgery, Plaintiff's knee was still stiff, but his range of motion was improving. Dr. Amendt planned the same surgery for Plaintiff's right knee, which was unstable and locking. (Tr., Pg. 742).

Plaintiff saw John Ellison, D.O., at the Holzer Clinic in Gallipolis in January, 2006 for persistent headaches. X-rays of the neck were taken and Plaintiff was given a prescription for Flexeril. (Tr., Pgs. 749-750). In February, 2006, Plaintiff saw Dr. Amendt, who reported that Plaintiff's knees were "doing great," but he was experiencing shoulder and left elbow pain. X-rays of the shoulder showed "some arthritic changes in the AC joint." The shoulder was injected with Xylocaine, Marcaine and Kenalog. (Tr., Pg. 751).

In July, 2004, Nancy Lares, M.D., certified that Plaintiff had COPD, emphysema, anxiety and a reflux disorder. He was taking Albuterol, Servent, Azmacort, Zantac and Zoloft. Dr. Lares indicated that Plaintiff's health status was "stable with treatment." Dr. Lares found moderate limitations of Plaintiff's ability to push/pull, bend, reach and handle. She found Plaintiff "employable with limitations." (Tr., Pgs. 754-758).

X-rays taken in January, 2006 of Plaintiff's cervical spine showed

"moderate narrowing at C5-C6 and C6-C7 and partial fusion at C2-C3." (Tr., Pgs. 762 and 768). In February, 2006, Plaintiff was discharged from physical therapy on his left knee after meeting all goals. (Tr., Pg. 763).

In February, 2004, Plaintiff was evaluated by Laberta Salamacha, a clinical psychologist. Plaintiff complained of insomnia, depression, difficulties with concentration and memory, panic attacks and excessive drinking. Plaintiff exhibited behavior, described by Ms. Salamacha as "bizarre," during the examination. He exhibited "impaired judgment, impulsivity and lapses of attention." His full-scale IQ was 101, a score within the average range. She described Plaintiff as "disorganized" and as a "risk- taker." She also described him as "rebellious" and "impulsive." Ms. Salamacha diagnosed Plaintiff with Schizophrenia, Paranoid Type, a diagnosis shared by no other therapist. She opined that Plaintiff was "currently unable to maintain employment" due to the "severity of his mental health problems." She rated Plaintiff as having "marked limitations" of his ability to maintain attention for extended periods, maintain regular attendance, complete a normal workday without interruptions from psychologically-based symptoms, interact with the public, respond to criticism, get along with co-workers and maintain socially appropriate behavior. (Tr., Pgs. 770-779).

In August, 2005, Dr. Amendt reported that 4 weeks after a Cortisone shot to Plaintiff's right elbow, he experienced pain after lifting. Plaintiff's elbow was injected with Xylocaine, Marcaine and Kenalog and a reference was made to physical therapy. (Tr., Pgs. 781-783). X-rays taken of Plaintiff's right elbow in July, 2005 were reported to be "normal," but Dr. Amendt referred to x-rays of Plaintiff's right elbow as "abnormal" and showing a "gun-sized spur."

16

Plaintiff reported pain in both elbows, with the right being much worse.

In November, 2005, Dr. Amendt surgically repaired a tear of the medial meniscus in Plaintiff's right knee. (Tr. Pgs. 792-811). In October, 2005, Dr. Amendt repaired a tear of the medial meniscus of Plaintiff's left knee. (Tr., Pgs. 813-829).

X-rays of Plaintiff's left shoulder in March, 2006 showed "mild osteoarthritic changes" and Plaintiff reported shoulder pain. His shoulder was injected with a mixture of Xylocaine, Marcaine and Kenalog. (Tr., Pg. 830-832).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment

that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Similarly, to qualify for SSI benefits, plaintiff must likewise file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

18

Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 CFR §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 CFR §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen,* No. 87-6189, slip op. at 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of*

19

*H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. §§ 404.1520a and 416.920a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R § 404.1520a(c)(3). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated

using a five-point scale: None, mild, moderate, marked, and extreme. The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do *any* gainful activity. 20 C.F.R. § 404.1520a(c)(4). Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe. 20 C.F.R. § 404.1520a(d)(1).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then complete a Mental Residual Functional Capacity Assessment form. This form also seeks to evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

"In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other

21

evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walter v. Commissioner*, 127 F.3d 525, 529 (6th Cir. 1997); *Shelman*, 821 F.2d at 321.

In determining whether disability has ceased, the Commissioner must consider the following steps: (1) Is the beneficiary working? If so (and there is no issue of a trial work period), the beneficiary is no longer disabled; (2) If a beneficiary is not working, do his or her impairments meet or equal a Listed Impairment? If so, the beneficiary is still disabled; (3) If the beneficiary's impairments do not meet or equal a Listing, has there been any medical improvement? If so, then the analysis proceeds to step four. If not, the analysis proceeds to step five; (4) Is the medical improvement related to the beneficiary's ability to work? If so, the analysis proceeds to step six. If not, the analysis proceeds to step five; (5) If there has been no medical improvement, or if the medical improvement is not related to the beneficiary's ability to work, does one

of the exceptions to medical improvement listed in 20 C.F.R. § 1594 (d) or (e) apply? If not, disability continues. If an exception in § 1594 (d) applies, the analysis proceeds to step six. If an exception in § 1594 (e) applies, the beneficiary is no longer disabled; (6) If medical improvement is related to the ability to work, are all current impairments severe in combination? If not, then the beneficiary is no longer disabled; (7) If the impairments are severe, the Commissioner determines the beneficiary's residual functional capacity (RFC) and considers whether the beneficiary can do his or her past work. If so, the beneficiary is no longer disabled; (8) If the beneficiary cannot do his or her past work, the Commissioner decides whether the beneficiary can do other work given his or her RFC, age, education, and work experience. If the beneficiary can, he or she is no longer disabled. If not, disability continues. 20 C.F.R. § 404.1594 (f).

The Contract with America Act of 1996 ("Welfare Reform Act"), Pub.L.No. 104-121, 110 Stat. 852, 853, prohibits the award of SSD and SSI to individuals for whom alcoholism or drug addiction is a contributing factor material to the Commissioner's determination that the individual is disabled. *See,* 42 U.S.C. §§423(d)(2)(C), 1382c(a)(3)(J). A finding of disability is a condition precedent to an application of §423(d)(2)(C). Obviously, if the claimant is found not disabled, despite whatever limitations he ore she has, including those related to substance or alcohol abuse, the question of whether claimant's limitations are impacted by such drug or alcohol use is moot. Thus, to determine whether a claimant's drug or alcohol addiction is a contributing factor material to the Commissioner's finding of disability, the Regulations essentially require the ALJ to perform a three part analysis. First, the ALJ must determine whether the claimant is disabled, taking into account the "gross" total of claimant's limitations, including the effects of any

substance use disorders. *Williams v. Barnhart*, 338 F. Supp.2d 849, 863 (W.D. Tenn. 2004)(citing *Brueggemann v. Barnhart*, 348 F.3d 689, 693-95 (8ᵗʰ Cir. 2003)). Second, that ALJ must make a determination that drug or alcohol use is a concern. *Id.* Third, the ALJ must determine, based on substantial evidence, what limitations would remain in the absence of claimant's alcoholism or drug addiction, and whether, based on those "net" limitations which do not encompass any limitations attributable to alcohol or drug use, plaintiff is disabled under the five step sequential evaluation process. *Id.* If the remaining or "net" limitations would be disabling, the drug abuse and alcoholism is not material, and the individual is disabled.; if the remaining limitations would not be disabling, the drug abuse and alcoholism is material and the individual is not disabled within the meaning of the Act. 20 C.F.R. §416.935(b)(2)(I)-(ii).

## OPINION

By his first Statement of Errors, Plaintiff challenges the ALJ's finding that alcoholism was a contributing factor material to the finding that Plaintiff was disabled prior to July 2004. Plaintiff's argument is that his primary deficiencies were mental and that his mental deficiencies were disabling, with or without the impact of alcoholism. In this respect, Plaintiff argues that his admitted substance abuse was a form of self-medication for pre-existing anxiety, depression and personality disorder. He also argues that all the clinical psychologists who evaluated him listed his mental disorders first and in the order of severity. Plaintiff makes specific reference to the ALJ's statement critical of Psychologist Salamacha's reference to alcoholism as being subordinate to a mental disorder in the hierarchy of clinical findings. While the ALJ's criticism of Ms. Salamacha's

diagnosis, in reference to the type of mental disorder she thought Plaintiff exhibited, was legitimate, the ALJ's conclusion that alcoholism should have been the primary clinical finding was clearly beyond the scope of the ALJ's purview. Plaintiff also criticizes the ALJ's conclusion to the extent it is based on 3 treatment notes within a 3-week period in July 2004, and the ALJ's reliance on the opinion of a non-examining and non-treating medical source.

The crux of Plaintiff's first argument seems to be that Plaintiff displayed mental health problems, including psychomotor agitation and anxiety before alcoholism became an issue. Plaintiff told Psychologist, Penny Perdue, that he started drinking at age 6. Plaintiff was born in 1962 and was 41 years old on the date of his first hearing. The incident where he fell from the hood of a moving car in the 1980s was alcohol-related. We don't know when Plaintiff's 3 DUI's occurred, but we assume that he was at least 18 years of age and prior to February, 2002, when he admitted to Psychologist, Sheila Emerson Kelly that he had three DUI convictions. Plaintiff testified that he was under counseling for drug and alcohol abuse multiple times, that he had trouble refraining from drinking after attempts to quit and that he attended AA, but didn't complete the program. Plaintiff also testified that only one of his 10 siblings is not an alcoholic. In short, Plaintiff presents a picture of one with a long-standing (approximately 35 years) problem with alcohol and significantly, a problem not fully addressed with the help of professionals. He says that he reduced his alcohol consumption in June, 2004 after meeting his wife and learning of her disapproval of his previous behavior. However, Plaintiff's testimony was that he still consumes one beer per night in order to sleep and has been intoxicated since his marriage to his well-intended spouse.

The question is not whether alcoholism hinders Plaintiff's ability to perform, because it obviously does. The question is not whether Plaintiff would be better off had he been able to cease drinking, because he surely would. The question is whether Plaintiff, having been found disabled because of a variety of physical and mental deficiencies, would still be disabled but for his alcohol dependance. In other words, the question is whether alcoholism is a contributing factor material to the finding that plaintiff was disabled by the combined effects of his physical and mental impairments, prior to 2004.

As set forth above, in order to find that drug abuse is material, the ALJ must make a determination that (1) Plaintiff is disabled based on his gross limitations; (2) drug or alcohol abuse is a concern; and (3) substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction. *Brueggemann* , 348 F.3d at 693-95. The ALJ's analysis properly included determinations, supported by substantial evidence, that plaintiff's gross impairments rendered him disabled. And the ALJ determined that Plaintiff's alcohol use is a concern, based on the medical records replete with evidence of alcohol abuse, alleged suicide attempts, hospitalizations, failed drug treatment programming, and the opinions of examining physicians and mental health sources. However, the ALJ failed to properly determine, based on substantial evidence in the record, what mental limitations would remain in the absence of Plaintiff's alcohol abuse.

The ALJ's conclusion that alcoholism is a contributing factor material to plaintiff's disability is based, in large measure if not entirely, on the opinion of Dr. Coppage, a paper reviewer. Defendant is correct when it asserts that Dr. Coppage's opinion is unrebutted in the sense that no other mental health

professional directly addresses the scope of what plaintiff's mental impairments or limitations would be in the absence of his alcoholism. However, this Court finds it troublesome that three other psychologists, Kelly, Salamacha and Perdue, all examining, but non-treating psychologists, could not voice an opinion, despite having conducted clinical interviews and administering test batteries to Plaintiff. Ms. Perdue remarked that extent of plaintiff's limitations absent his alcoholism was "unknown" because Plaintiff had abused alcohol from such an early age. Ms. Kelly stated in her report that the extent of plaintiff's mental limitations absent his alcohol abuse was "unclear." In completing her evaluation form, Ms. Salamacha did not respond to the question. Nevertheless, Dr. Coppage determined, based solely on his review of the file, which includes the reports from Perdue, Salamacha, and Kelly, that Plaintiff's alcoholism is a factor material to the disability finding. In effect, Dr. Coppage determined that absent alcohol use, plaintiff's the limitations caused by Plaintiff's mental impairments would not be significant enough to render him disabled.

Unfortunately, Dr. Coppage does not make clear what medical records beyond those discussed above, evaluation results, or expertise of his own, compels such a conclusion. Nor does the ALJ. If, as a paper reviewer, Dr. Coppage relies solely on the medical file, and the file contains reports in which the only mental health professionals to have evaluated Plaintiff deem the extent of Plaintiff's mental limitations absent alcohol abuse to be "unknown" or "unclear," the cursory and unsupported conclusions by Dr. Coppage as to Plaintiff's mental functioning in the absence of alcohol abuse do not constitute substantial evidence in support of the ALJ's ultimate findings.

In support of his findings that plaintiff was disabled but that alcoholism was

27

a contributing factor material to the disability finding before July 2004, and in support of his conclusion that plaintiff was no longer disabled as of July 2004, the ALJ points to three mental health treatment notes from June 28, July 16, and July 22, 2004. The note of June 28, apparently written by a physician's assistant and approved by Ms. Dick, the supervising psychologist, was that Plaintiff reported that his mood was "a lot better" and that his girlfriend won't let him drink. On July, 16, Plaintiff reported that his "feelings of depression have decreased significantly." On July, 22, Plaintiff reported that his mood was "stable," but that he admitted to suicidal thoughts and sexual fantasies regarding his 15-year-old neighbor. On each of these three visits, Plaintiff acknowledged that he was still drinking.

These treatment notes show only nominal progress within a period of less than one month. They do not constitute substantial evidence that plaintiff's mental functioning limitations had improved to the extent that he was no longer disabled. Such a conclusion would clearly require additional examination and or testing by a mental health professional, not merely anecdotal self-reported "improvement," especially in a case where the limitations are based on significant mental health problems. Suicidal ideation, admitted continued use of alcohol, and pedophilic fantasies do not strike the Court as signs of "improvement." Although the Plaintiff cites us to a quote from the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), relative to the causation of symptoms of mental disorders, we deem it to be self-evident that if symptoms of mental disease persist after intoxication or withdrawal, it would most likely mean that these symptoms were not caused by the effects of alcohol. The three treatment notes do not really help resolve the question before us. Nor doe they constitute substantial evidence in support of the

28

ALJ's determination that plaintiff was not longer disabled as of July 2004.

What we have is a non-treating and non-examining paper reviewer, Dr. Coppage, who holds a Ph.D. degree and who had before him the psychological evaluations prepared by Psychologists Kelly and Perdue, as well as the Discharge Summary, prepared by Psychiatrist, Dr. Jack Dodd, from St. Mary's Medical Center in Huntington. There is no direct evidence in the form of a contrary opinion. There is only an inability to respond to the question concerning Plaintiff's possibly disabled status absent the effects of alcohol on the part of three clinical psychologists, none of whom holds a Ph.D. degree, but each of whom examined, interviewed and tested Plaintiff. As much as it pains us to remand this case, due process demands that an independent medical expert, a clinical psychologist with a Ph.D. degree or a psychiatrist, *review the entire record* and *explain*, if possible, the extent of plaintiff's limitations caused by his mental impairment, absent his addiction to alcohol. Such an expert should clearly explain the basis for his or her opinion, including those portions of the existing record, and or any information gleaned from additional testing, if deemed necessary, which supports his or her conclusions.

Plaintiff also argues that in a situation, such as this one, where psychological consultants cannot project what a claimant's deficits would be if alcohol ingestion ceased, Social Security policy (EM-96) favors a finding that alcohol is not a contributing and material factor to a determination of disability. As Plaintiff argues, his mental/emotional disorders, Depressive Disorder and Anxiety Disorder, were diagnosed from clinical interviews, patient histories and psychological testing and these diagnoses were consistent during periods of heavy drinking and otherwise. In fact, as Plaintiff argues, a GAF of 40 was assigned two

months previous to the treatment notes of June and July, 2004, the period during which Plaintiff had allegedly improved.

It is far from clear whether Plaintiff would possess the skills necessary to engage in competitive employment but for his problem with alcoholism. We find the ALJ's overly-simplistic rationale to be erroneous, and the need for a medical expert to help resolve this issue by explaining his/her opinion to be compelling. As reluctant as we are to further remand this case, we have no reasonable choice.

The second Statement of Error challenges the ALJ's weighing of the evidence, in particular, the opinions of Dr. Adams, a treating source, examining psychologist Salamacha and Dr. Lares, who also examined, but did not treat Plaintiff. Dr. Adams indicated that Plaintiff had poor work potential because of a combination of physical and psychiatric problems, which she did not relate to substance abuse. Dr. Adams is an internist, who made a referral of Plaintiff to psychologists, Cody and Dick. Her opinion was not mentioned in the ALJ's decision.

Ms. Salamacha's opinion was criticized as being motivated, at least in part, by financial bias, since Plaintiff's counsel made the referral to her. This approach is questionable. However, Ms. Salamacha's report was also criticized because of her interpretation of the elevated "F" scale as shown by MMPI testing and because of the fact that her diagnosis of paranoid schizophrenia was not shared by any other treating source. The second two bases were legitimate.

Dr. Lares, as was pointed out by defendant, is not a treating physician. Her report focuses on Plaintiff's physical problems and specifically his COPD and emphysema. Dr. Lares found Plaintiff employable "with limitations." The report of Dr. Lares is not particularly helpful to Plaintiff, but deserved some

30

consideration, especially in light of the conclusion of Dr. Adams that Plaintiff's various problems should be viewed in combination. Had the ALJ given the report more weight than he did, it is doubtful that Plaintiff's position would have been helped. In any event, Plaintiff's COPD problem was "moderate" after a pulmonary function test is 2002. We do not find that Plaintiff's argument in support of the second Statement of Error merits a reversal.

The third Statement of Error is that the residual functional capacity assessment, formulated by the ALJ was deficient because the restriction to "simple one and two step instructions and routine repetitive tasks, not involving a rapid, constant or machine-driven pace, and with minimal interaction with co-workers and others" is not a function by function assessment as required by Social Security Ruling 96-8p. We disagree. The ALJ's residual functional capacity assessment dealt with the functional limitations which Plaintiff displayed. The fact that his RFC did not reflect other limitations was a reflection of the fact that Plaintiff did not exhibit other deficiencies. Plaintiff displayed a limited ability to understand, remember and carry out instructions, a limited ability to respond appropriately to supervision, coworkers and the public, and a limited ability to respond to pressure. The ALJ's RFC determination dealt with all of these limitations. The ALJ made no error here.

The fourth and last Statement of Error was critical of the ALJ's credibility assessment regarding Plaintiff. The credibility assessment is critical of the ALJ's assessment of Plaintiff's subjective complaints of pain. We disagree that the ALJ's analysis of Plaintiff's complaints of elbow, shoulder and knee pain was deficient. In any event, the troublesome aspect of this case is not related to Plaintiff's physical problems, which were adequately addressed by the ALJ's

31

hypothetical question, but the relationship between his much more significant mental deficiencies and his alcoholism.

## CONCLUSION

IT IS THEREFORE RECOMMENDED that this case be remanded for a complete record review, opinion and explanation of that opinion by an experienced clinical psychologist or psychologists at the Ph.D. level or experienced psychiatrist or psychiatrists the extent of Plaintiff's mental limitations expected to persist, and plaintiff's mental RFC, absent his alcoholism.

February 6, 2009

Timothy S. Hogan
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MITCHELL BLANKENSHIP,**
**PLAINTIFF**

**CASE NO. 1:07-cv-1004-SAS-TSH**
**(SPIEGEL, Sr. J.)**
**(HOGAN, M. J.)**

**VS.**

**COMMISSIONER OF SOCIAL SECURITY,**
**DEFENDANT**

## NOTICE

Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 2/6/2009. Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).